# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN FRANCISCO

FILED
Oct 19 2021
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES OF AMERICA,

V.

CR 21-0402 RS

HARLAN KELLY, and
VICTOR MAKRAS,

DEFENDANT(S).

## INDICTMENT

18 U.S.C. § 1349-- Conspiracy to Commit Bank Fraud
18 U.S.C. § 1344(1), (2) – Bank Fraud
18 U.S.C. § 1349 – Conspiracy to Commit Honest Services Wire Fraud
18 U.S.C. §§ 1343, 1346 – Honest Services Wire Fraud
18 U.S.C. § 2 _ Aiding and Abetting
28 U.S.C. § 2461(c) – Forfeiture Allegation

A true bill.

/S/ Foreperson of the Grand Jury

Foreman

Filed in open court this ___19th___ day of

October 2021
_____.

_____ Clerk

Bail, $ No Bail

Hon. Thomas S. Hixson, U.S. Magistrate Judge

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

FILED

Oct 19 2021

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> HARLAN KELLY, and <br> VICTOR MAKRAS, <br><br> Defendants. | CASE NO.   CR 21-0402 RS <br><br> VIOLATIONS: <br><br> 18 U.S.C. § 1349-- Conspiracy to Commit Bank Fraud <br> 18 U.S.C. § 1344(1), (2) – Bank Fraud <br> 18 U.S.C. § 1349 – Conspiracy to Commit Honest Services Wire Fraud <br> 18 U.S.C. §§ 1343, 1346 – Honest Services Wire Fraud <br> 18 U.S.C. § 2 _ Aiding and Abetting <br> 28 U.S.C. § 2461(c) – Forfeiture Allegation <br><br> SAN FRANCISCO VENUE |

## I N D I C T M E N T

The Grand Jury charges:

### Introductory Allegations

At all times relevant to this Indictment:

1.     Defendant HARLAN KELLY (KELLY) was the General Manager of the San Francisco Public Utilities Commission (PUC), a position he was appointed to in 2012 and held until November 30, 2020.  Prior to his appointment to head the public utilities agency, KELLY was the Assistant General Manager of Infrastructure, responsible for implementing billions of dollars in capital improvements for water, sewer, and power in the City and County of San Francisco, California.

INDICTMENT

2. Defendant VICTOR MAKRAS was a real estate broker and principal of Makras Real Estate, a corporation which provides professional real estate service in the San Francisco Bay Area, including property management and residential sales. MAKRAS brokered a consortium of individual real estate investors ("Makras Investors") who collectively made residential real estate loans secured by real property in the San Francisco Bay Area and elsewhere. MAKRAS had also been a PUC Commissioner, served on the San Francisco employees retirement board, and had served as a Commissioner on the San Francisco Port Commission.

3. Contractor #1 was a construction company executive and permit expediting consultant who ran or controlled multiple entities that did business with the City and County of San Francisco.

4. At times relevant to this Indictment, NK was the San Francisco City Administrator, a position which is the highest non-elected position in the City and County of San Francisco, in charge of overseeing many of the city's departments. NK resigned her position as City Administrator, effective February 1, 2021.

5. KELLY and NK owned and resided in a home (the "KELLY residence") in San Francisco, California.

6. Quicken Loans is a financial institution as that term is defined at 18 U.S.C. § 20 and 31 U.S.C. § 5312(a)(2).

The Conspiracy and Scheme to Defraud Quicken Loans

7. Beginning at a date unknown to the Grand Jury, but no later than in or about November 2013, and continuing through a date unknown, but to at least in or about June 2015, defendants HARLAN KELLY and VICTOR MAKRAS engaged in a scheme, plan, and artifice to defraud Quicken Loans, a lending and financial institution, as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making materially false and misleading statements, and failing to disclose material facts with a duty to disclose. The objectives of the scheme to defraud were, among other objectives, (a) to falsely inflate the amount of KELLY's mortgage balance owed to Makras Investors in order to obtain additional funds from Quicken

INDICTMENT                                    2

Loans at a lower interest rate than would have been charged for a cash-out loan, (b) to conceal existing debts from Quicken Loans, including a large receivable KELLY owed to Contractor #1 for construction work performed during a remodel on the KELLY residence and a large personal loan made from MAKRAS to KELLY and NK, and (c) to repay undisclosed outstanding debts from the loan proceeds in a manner designed to conceal that KELLY and NK were using a portion of the loan proceeds to repay these debts.

Manner and Means

8. In furtherance of the conspiracy and to affect the objects thereof, in the Northern District of California and elsewhere, HARLAN KELLY and VICTOR MAKRAS and others known and unknown to the grand jury used the following manner and means in an effort to fraudulently obtain a $1,300,000 refinance loan from Quicken Loans:

   a. Beginning sometime after July 17, 2012 and before April 23, 2014, KELLY received authorization from the City and County of San Francisco, Department of Building Inspection for an extensive remodel of the Kelly residence.

   b. On or about September 10, 2012, KELLY and NK executed a "Straight Note" to Makras Investors for a $715,000 interest only loan with monthly payments of $4,766.66, which loan was secured by the Kelly residence and two other parcels of real property.

   c. Beginning no later than October 2013 and continuing through July 2014, Contractor #1 performed some of the construction work for the remodel of the Kelly residence.

   d. On or about November 29, 2013, KELLY sought a personal loan from MAKRAS and sent a text message to MAKRAS stating: "I believe 70 will give us a contingency until February. But we will [make] any amount work."

   e. On or about November 30, 2013, in connection with KELLY's previous inquiry about a personal loan, MAKRAS sent a text message to KELLY stating: "After thinking about it A bit, I recommend that I pay your credit cards directly. This will avoid a large check going into your account, Then needing to explain it to the bank. Banks do not like seeing

INDICTMENT                                      3

anything unusual about the flow of cash in and out of checking savings accounts. This will make the loan process go easy."

f. On December 1, 2013, KELLY responded to MAKRAS's November 30, 2013 text message stating: "I agree and just emailed you our credit card statements."

g. On or about December 2, 2013, MAKRAS caused four checks to be issued from his Bank of America Victor G. Makras Inc account ending in 2817 and totaling $70,000 to pay off outstanding credit card balances owed by KELLY and NK as follows:

   i. $37,441.05 to KELLY Bank of America credit card ending 8667,
   ii. $22,000.00 to NK JP Morgan Chase credit card ending 5864,
   iii. $8,685.69 to NK JP Morgan Chase credit card ending 2650,
   iv. $1,873.26 to NK JP Morgan Chase credit card ending 2475.

h. On or about April 23, 2014, Building Inspector "BC" signed a Certificate of Final Completion and Occupancy which included a hand-written description of the construction as "Conversion of a SFD to a duplex. Electrical and Plumbing under separate permits."

i. On or about April 25, 2014, KELLY sent a text message to MAKRAS stating: "Victor, I wanted to cash out 200K. This amount is for [sic] pay for money received and money owed and pay off [NK] student loan. If you can put in a note saying I owe it all good! We can move forward."

j. On or about May 1, 2014, MAKRAS emailed KELLY and NK a "Straight Note Modification" which was backdated to December 2, 2013 and purported to amend the original September 10, 2012 Note to Makras Investors by providing for an "Additional advance up to $200,000."

k. On or about June 24, 2014, in connection with KELLY's effort to refinance the KELLY residence, MAKRAS emailed Old Republic Title Company and falsely stated that KELLY's principal balance on the loan from Makras Investors was $900,000.

l. On or about July 2, 2014, MAKRAS submitted a "Written Payoff Demand Statement" to Old Republic Title Company which falsely stated that the principal balance owed to Makras Investors by KELLY and NK was $915,000.

INDICTMENT    4

m. On or about September 5, 2014, a Residential Loan Application was submitted to Quicken Loans to refinance the KELLY residence in which KELLY and NK falsely stated that the unpaid balance owed to "Victor Makras" was $915,000.

n. In connection with their loan application to Quicken Loans, KELLY and NK also submitted to Quicken Loans the "Straight Note Modification" that had been signed by KELLY and NK and backdated to December 2, 2013 and which falsely stated that KELLY and NK owed an additional $200,000 on the original loan made by Makras Investors.

o. On or about October 11, 2014, a final loan application signed by KELLY and NK was submitted to Quicken Loans in which they falsely stated that the loan balance owed to Makras Investors was $915,000 and that the monthly payment on this loan was $4,766.00.

p. As of October 11, 2014, KELLY and NK had not paid Contractor #1 for work Contractor #1 performed on the remodel of the Kelly residence and had not repaid MAKRAS's $70,000 personal loan.

q. On or about October 20, 2014, Quicken Loans funded a $1,300,000 refinance loan on behalf of KELLY and NK to pay off the loan to Makras Investors in the amount of $915,000 and the existing first mortgage with JP Morgan Chase in the amount of $371,602.95.

r. On or about October 27, 2014, Contractor #1 submitted an invoice to KELLY in the amount of $89,807.80 for construction work Contractor #1 performed on the Kelly residence from October 2013 through July 2014.

s. In or around November 2014, Makras Real Estate prepared a "Consolidated Detailed Property Statement" stating a beginning balance of $138,425.11, which included $130,000, reflecting the approximate amount of the remaining proceeds left over from the Quicken Loans after the true amount of the $715,000 Makras Investors loan and the MAKRAS $70,000 personal loan to KELLY and NK had been paid off.

t. MAKRAS retained the excess amount of approximately $130,000 from the KELLY

INDICTMENT                                    5

Quicken Loans proceeds in his Bank of America "Makras Real Estate Trust account 2" ending in 0265.

u. On or about November 11, 2014, MAKRAS caused a check to be issued from his Bank of America Makras Real Estate Trust account 2 ending in 0265 to Contractor #1 in the amount of $89,807.80 for the unpaid amount KELLY owed Contractor #1 for the October 2013 through July 2014 remodel work performed on the Kelly residence.

v. On or about November 26, 2014, MAKRAS caused a check to be issued from his Bank of America Makras Real Estate Trust account 2 ending in 0265 in the amount of $17,000 to Chase Card Services for an unpaid receivable owed by NK to Chase Card Services.

w. On or about November 26, 2014, MAKRAS caused a check to be issued from his Bank of America Makras Real Estate Trust account 2 ending in 0265 for $10,994 to Sunrun Solar for work performed by Sunrun Solar on the Kelly residence.

x. On or about December 10, 2014, MAKRAS caused a check to be issued from his Bank of America Makras Real Estate Trust account 2 ending in 0265 in the amount of $13,298 to Henry Gertmenian for an outstanding receivable in connection with the Kelly residence.

y. On or about April 8, 2015, KELLY sent a text message to MAKRAS stating: "Hey Victor, based on my memory and using round numbers, checks issued were 90K, 13K, 17K, and 10K = 130K of the 138K. However, I have not yet used the 10K check yet. I would like to issue a 16K instead. The remaining balance goes to duckhorn cab."

COUNT ONE: 18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud)

9. Paragraphs 1 through 8 of this Indictment are re-alleged and incorporated as if fully set forth here.

10. Beginning at a date unknown, but no later than in or about November 2013 and continuing through a date unknown, but at least until June 2015, in the Northern District of California and elsewhere, the defendants,

HARLAN KELLY, and
VICTOR MAKRAS,

INDICTMENT                                           6

and others known and unknown to the Grand Jury, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud Quicken Loans, a financial institution, as to a material matter and to obtain money and property under the control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts and omissions of material facts with a duty to disclose, in violation of Title 18, United States Code, Section 1344.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO: (18 U.S.C. § 1344(1), (2) – Bank Fraud)

11. The factual allegations of Paragraphs 1 through 8 are re-alleged and incorporated as if fully set forth here.

12. Beginning at a date unknown, but no later than in or about November 2013, and continuing through a date unknown, but no earlier than on or about June 2015, in the Northern District of California and elsewhere, the defendants,

HARLAN KELLY, and
VICTOR MAKRAS,

and other known and unknown to the Grand Jury, did knowingly, and with the intent to defraud, devise and execute, and attempt to execute, a material scheme and artifice to defraud financial institutions, including but not limited to those identified in the Count below, and to obtain moneys, funds, credits, assets, and other property that were then under the custody and control of a financial institution, by means of materially false and fraudulent pretenses, representations, and promises.

Execution of the Scheme

13. On or about the date set forth in the count below, in the Northern District of California and elsewhere, for the purpose of executing the scheme and artifice referred to above, and attempting to do so, defendants conducted or caused to be conducted the following financial transaction, among others:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| TWO | 10/20/2014 | $1,300,000 in the name of KELLY and NK from Quicken Loans, of which $915,000 was to pay off the Makras Investor loans. |

INDICTMENT                                                   7

All in violation of Title 18, United States Code, Sections 1344(1), (2) & 2.

## The Honest Services Scheme to Defraud

14. Beginning on a date unknown, but no later than September 2014, and continuing until on or about September 2019, in the Northern District of California and elsewhere, defendant HARLAN KELLY, a public official, knowingly, and with the intent to defraud, participated in, devised, and intended to devise a scheme and artifice to defraud the public of its right to the honest services of public officials through bribery and kickbacks in breach of the official's fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts. The objectives of the scheme to defraud were, among other objectives, (a) to provide Contractor #1 with a competitive advantage during the bidding process for contracts with the City and County of San Francisco by giving Contractor #1 confidential internal PUC information and documents to enable Contractor #1's bids to be more competitive; (b) in exchange for personal financial benefits from Contractor #1 including, but not limited to, discounted construction work on the Kelly residence, subsidized international vacations for KELLY and his family, and lavish gifts.

## Means and Methods

15. In furtherance of the scheme, and to affect the objects thereof, in the Northern District of California and elsewhere, defendant KELLY and others known and unknown to the grand jury used the following manner and means in an effort to defraud the citizens of the City and County of San Francisco of their right to the honest services of public officials:

   a. Beginning no later than October 2013 and continuing through July 2014, Contractor #1 performed approximately $89,807.80 of construction work on the Kelly residence. Contractor #1 did not collect payment for this construction work until on or about November 11, 2014 when MAKRAS caused a check to be issued from MAKRAS's Bank of America Makras Real Estate Trust account 2 ending in 0265 to Contractor #1 in the amount of $89,807.80.

   b. On or about September 16, 2014, the San Francisco Public Utilities Commission (SFPUC) issued RFP 79002 - Request for Proposals (RFP) for LED Luminaires With Wireless Network Control System. A pre-proposal conference was set for September 30,

INDICTMENT                        8

    2014 with proposals due by October 27, 2014.  The due dates were subject to change and as set forth below did, in fact, change several times.

c. On or about September 17, 2014, KELLY used his personal cell phone and texted Contractor #1: "Yes we finally got it out.  Keep me posted on you [sic] your proposal. (any problems). Panel is the next step."  Contractor #1 replied: "Ok see you tomorrow."

d. During the first week of November 2014, KELLY and Contractor #1 attempted to meet in person.

e. After KELLY and Contractor #1 missed a meeting they had planned for November 4, 2014, KELLY arranged by text message to meet at Contractor #1's office restaurant on November 5, 2014.

f. On or about November 11, 2014, KELLY texted Contractor #1: "I need to give you a document."

g. On or about November 13, 2014, the day before the amended LED RFP was publicly released, Contractor #1 and KELLY arranged by text message to personally deliver confidential PUC documents to Contractor #1 by having Contractor #1 drive in front of the PUC office and call KELLY when Contractor #1 was "down stairs."

h. On or about November 13, 2014, KELLY sent someone to the ground floor of the PUC office to deliver the confidential PUC internal documents to Contractor #1.

i. On or about November 13, 2014, Contractor #1 confirmed receipt of the confidential internal PUC documents and texted KELLY "Pick up from front desk."  KELLY responded by text message, "Call me after u read the docs."

j. On or after November 4, 2014, KELLY provided Contractor #1 with additional confidential internal PUC documents regarding the project. Among the materials Contractor #1 received from KELLY was a PUC memorandum titled "RFP 79002 Bid Review," dated November 4, 2014.

k. The November 4, 2014 PUC memorandum that KELLY gave Contractor #1 purported to

INDICTMENT                                          9

"analyze[] the reasons for the variance between actual pricing and anticipated pricing for RFP 79002 - LED Street Lights with a Wireless Control System." Among other things, this PUC internal memorandum contained tables summarizing and ranking the cost proposals for the 31 bids received by the PUC for the September RFP, identifying the bidder by name, the type of LED fixture used in the bid, the type of control for the LED used in the bid, and the costs associated with each LED fixture and control for each bid.

l. On or about November 13, 2014, KELLY used his personal cell phone and texted Contractor #1:

  i. Al will triple check but we both believe the minimum quals are pass/fail.
  ii. The LBE [Local Business Entity] points apply at all stages of the evaluation that are subjective (as opposed to min quals which is objective) thus they apply to the raw score at the quality evaluation and cost evaluation stages.
  iii. There were 4 of 31 proposals that initially we thought did not pass min quals; however, now we believe we will salvage 2 of the 4 - maybe 3 proposals. Al can speak with Mary tomorrow and provide you more details.

m. On or about November 21, 2014, the PUC formally issued its amended RFP titled LED Luminaires with Wireless Network Control System, RFP 79002-A. The RFP set a pre-proposal conference for December 11, 2014 and a new due date for proposals of January 9, 2015.

n. On or about January 5, 2015, KELLY notified Contractor #1 by text, using KELLY's personal cell phone, that the PUC planned to delay the deadline for submitting RFPs for the Smart LED light contract. KELLY texted Contractor #1: "We are going to postpone the LED light dates." Contractor #1 replied "Till when," to which KELLY responded: "Weeks." KELLY also provided Contractor #1 with a name and number of an individual in the East Bay who had attended the pre-proposal conference in December.

o. On or about January 15, 2015, Contractor #1 and KELLY exchanged the following text messages about the Smart LED light project:

INDICTMENT                                       10

1     Contractor #1: Current LED RFP does not require any assembly in SF
2     KELLY: We legally can't requirer [sic] that. However, you can place that in the special consideration. Also one of the competitor [sic] already assemble in SF

R u certified?

6     Contractor #1: not yet

7     KELLY: Did u talk with [name of individual provided on January 5, 2015]

8     Contractor #1: waiting for control ULwe wont get till Jan 31

9     KELLY: UL? You told me you had everything?

10     Contractor #1: The control from France just received information from UL

11     KELLY: You told me That you had everything? I don't know what to do? I don't know how to stop the process anymore

    p. On or about January 27, 2015, Contractor #1 sent a text message to KELLY's personal cell phone stating: "tech team reply, what you request is possible, do u have time to go over what we find."

    q. On or about January 27, 2015, Contractor #1 texted KELLY "are you intown [sic]?" KELLY replied "Yes, let me get the specs."

    r. On or about January 30, 2015, Contractor #1 and KELLY had the following text message exchange:

Contractor #1: Good morning do u have a few minutes to catch up

KELLY: Ok can you send some [sic] one over to pick up specs

Contractor #1: yes what time

who should we see

    s. Later the same day, the private text messages between KELLY and Contractor #1 about the LED Smart light RFP continued:

Contractor #1: can we go to pick up package yet

KELLY: Come now to my office

Contractor #1: what floor

INDICTMENT                                     11

1       on our way ps let u know what floor
2       Green Source Trading, LLC
3   t.  On or about January 30, 2015, after Contractor #1 had received the "package" from
        KELLY, Contractor #1 texted KELLY and stated: "review info we have question ps let
        me know when can i call you."
6   u.  On or after May 20, 2015, KELLY gave Contractor #1 a paper copy of an email dated
        May 20, 2015, which was addressed to KELLY and was from the PUC project manager
        who was in charge of the LED Smart Lights RFP. The subject of the email was "LED
        RFP Follow Up Information."
10  v.  On or after May 20, 2015, KELLY also gave Contractor #1, a spreadsheet titled "Harlan
        Summary," which had been attached to the email referred to in paragraph 15 u. The
        spreadsheet listed various costs and licensing fees for LED control software by different
        vendors and evaluated software and cellular data costs over a 15-year period. The top
        three ranked "controls systems" are also identified.
15  w.  On or after July 7, 2015, KELLY provided Contractor #1 with another hard copy
        spreadsheet titled "Summary Score Sheet w/LBE Discount" and dated July 7, 2015. This
        spreadsheet was accompanied by a sticky note, a copy of which KELLY also gave to
        Contractor #1, that stated, "Harlan, This is the final spreadsheet produced by [employee]
        for use by OCA [Office of Contract Administration]." The spreadsheet also ranked
        bidders by their scores and highlights the top 10 bids, including LBE discounts.
        Contractor #1's company was ranked near the bottom.
22  x.  On or after July 26, 2015, KELLY gave Contractor #1 additional confidential internal
        PUC information on the bidding process, including hard copy spreadsheets titled "RFP
        79002-A Summary Score Sheet 1" for each panelist who was ranking the bids.
25  y.  In or around September 2015, the PUC decided not to award the LED Smart lights
        contract to any bidder. Instead, the PUC issued a new RFP for the project, in September
        of 2016, this time as "TC 79004 LED LUMINAIRES."
28  z.  In or around March 2016, during the period between the aborted 2015 RFP and before

INDICTMENT                                  12

bids were due for the September 2016 Smart LED Lights RFP, Contractor #1 helped arrange for a personal vacation to Hong Kong and China for KELLY and his family. Contractor #1 accompanied KELLY and KELLY's family for a portion of the KELLY family vacation.

aa. In or around March 2016, Contractor #1 paid for various personal expenses for KELLY, his wife, mother-in-law, and two children, during the KELLY family vacation including, but not limited to, meals costing hundreds of dollars, jewelry, and hotel charges.

  i. On or about March 25, 2016, Contractor #1 used his American Express credit card ending in 51005 to purchase jewelry costing $418.95 from Chow Tai Fook Jewellery Co. Ltd. for the benefit of KELLY and NK.

  ii. On or about March 26, 2016, Contractor #1 used his American Express credit card ending in 51005 to pay $615.41 for a meal for the KELLY family at the Intercontinental HK Harbourside Restaurant in Hong Kong.

  iii. On or about March 30, 2016, Contractor #1 charged $2,011.40 on his American Express credit card ending in 51005 to the Mira Hotel in Hong Kong to pay for KELLY and NK's stay at the Mira hotel.

bb. On or after November 22, 2016, KELLY provided hard copy internal PUC documents to Contractor #1, which were specifically notated as "Confidential," including spreadsheets titled "TC 79004 LED LUMINAIRES BID SCREENING OVERVIEW," and "TC 79004 LED LUMINAIRES SECTION 90 RESPONSIVE BID REVIEW."

cc. On or before April 2017, Contractor #1 performed repair work on KELLY's residence. Contractor #1 invoiced KELLY $23,236 for the repairs, but only charged KELLY $11,547 for that work.

COUNT THREE: 18 U.S.C. § 1349 – Conspiracy to Commit Honest Services Wire Fraud)

16. Paragraphs 1 through 15 of this Indictment are re-alleged and incorporated as if fully set forth here.

17. Beginning at a date unknown, but no later than in or about September 2014 and continuing through a date unknown, but at least until September 2017, in the Northern District of

INDICTMENT                13

California and elsewhere, the defendant:

HARLAN KELLY

and others known and unknown to the Grand Jury, including Contractor #1, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud the public of its right to the honest services of public officials through bribery and kickbacks in breach of the official's fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, in violation of Title 18, United States Code, Section 1343 and 1346.

All in violation of Title 18, United States Code, Section 1349.

COUNTS FOUR THROUGH SEVEN: (18 U.S.C. § 1343, 1346 – Honest Services Wire Fraud)

18. The factual allegations of Paragraphs 1 through 15 are re-alleged and incorporated as if fully set forth here.

19. On or about the dates set forth below, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud the public of its right to the honest services of public officials and attempting to do so, defendant KELLY did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds; specifically, American Express credit card charges made in Hong Kong by Contractor #1, on an account established and addressed and billed in San Francisco, in the Northern District of California and an email account located in the Northern District of California which transmitted to and from interstate commerce:

| COUNT | DATE | Wire Transmission |
|---|---|---|
| FOUR | 3/25/2016 | $418.95 (USD) Charge, Chow Tai Fook Jewellery Co. Ltd., Hong Kong, on Contractor #1's American Express card, number ending 51005 |
| FIVE | 3/26/2016 | $615.41 (USD) Charge, Intercontinental HK Harbourside Restaurant, Hong Kong, on Contractor #1's American Express credit card, number ending 51005 |
| SIX | 3/30/2016 | $2,011.40 (USD) Charge, Mira Hong Kong, on Contractor #1's American Express credit card number ending 51005 |
| SEVEN | 8/11/2017 | Email from Jaidin Consulting to KELLY with water damage repair invoices totaling $23,326.69 |

All in violation of Title 18, United States Code, Sections 1343, 1346.

INDICTMENT                                  14

FORFEITURE ALLEGATION:   (18 U.S.C. § 981(a)(1)(C), 982(a)(2)(B) and 28 U.S.C. § 2461(c))

20. All of the allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(B) and Title 28, United States Code, Section 2461(c).

21. Upon conviction for any of the set forth in Counts One through Seven of this Indictment, the defendants,

HARLAN KELLY, and<br>VICTOR MAKRAS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(B) and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations, including but not limited to a money judgment equal to the gross proceeds the defendant obtained directly or indirectly as a result of those violations.  If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

//
//
//
//
//
//
//

INDICTMENT                              15

All pursuant to Title 18, United States Code, Section 981(a)(1)(A), 982(a)(1) and (a)(2)(B), and 924(d)(1); Title 28, United States Code, Section 2461(c); and Federal Rule of Criminal Procedure 32.2.

DATED: October 19, 2021                          A TRUE BILL.


                                                                               /S/
                                                                    FOREPERSON

STEPHANIE M. HINDS
Acting United States Attorney

/S/
ROBIN L. HARRIS
Assistant United States Attorney

/S/
DAVID J. WARD
Assistant United States Attorney

INDICTMENT                          16