1  STEPHANIE M. HINDS (CABN 154284)
   United States Attorney
2
   THOMAS A. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  DAVID J. WARD (CABN 239504)
   ZACHARY G.F. ABRAHAMSON (CABN 310951)
5  Assistant United States Attorneys

6     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
7     Telephone: (415) 436-7200
      FAX: (415) 436-7234
8     david.ward@usdoj.gov

9  Attorneys for United States of America

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13
   UNITED STATES OF AMERICA,          )  No.  CR 21-0402 RS
14                                     )
          Plaintiff,                   )  UNITED STATES' OPPOSITION TO
15                                     )  DEFENDANT MAKRAS' MOTIONS IN LIMINE
      v.                               )
16                                     )  Pretrial Conf.:  July 27, 2022, 9:30 a.m.
   VICTOR MAKRAS,                      )  Dept: Courtroom 3 – 17th Floor
17                                     )  Judge: Hon. Richard Seeborg
          Defendant.                   )
18                                     )
                                       )
19  _____ )

20  **I.  INTRODUCTION**

21         Defendant Victor Makras seeks to wholesale exclude all of the government's evidence in its

22  revised 404(b) notice, mischaracterizing it as evidence tied only to the honest services fraud charges

23  against co-defendant Harlan Kelly.  In fact, the evidence the government seeks to introduce is

24  inextricably intertwined with, and directly related to, the bank fraud charges against defendant Makras.

25  The evidence is also admissible under Fed. R. Evid. 404(b) because it goes to Makras and co-defendant

26  Kelly's motive, intent, and lack of accident and mistake in committing the charged offenses.  The

27  evidence should be admitted.

28

## II.   DEF. MOTION IN LIMINE NO. 1: EVIDENCE OF KELLY'S CONSTRUCTION DEBTS AND CORRUPT RELATIONSHIP WITH CONTRACTOR WONG SHOULD BE ADMITTED

### a.   THE EVIDENCE IS INEXTRICABLY INTERTWINED WITH THE BANK FRAUD CHARGES

Makras and co-defendant Harlan Kelly are charged with making false statements and representations to Quicken Loans as part of a scheme to secure a $1.3 million mortgage refinance for co-defendant Kelly and his wife, Naomi Kelly on their residence on 11th Avenue in San Francisco.  As part of its proof of these misrepresentations, the government has given notice that it intends to introduce evidence that at the time of the Quicken Loan application, Kelly had over $89,000 in unpaid construction debt that was not disclosed to Quicken.  The government's evidence will show that Quicken specifically wanted to know, and required the borrower to disclose, unpaid construction debts. This information was material to Quicken.  Thus, the admission of evidence that Kelly had this $89,000 in unpaid construction debt is inextricably intertwined with the bank fraud and false statements to the bank charges.  Kelly's concealment of the debt, and Makras' participation in that concealment, forms one of the bases for the false statement and fraudulent misrepresentation to Quicken.

Defendant Makras concedes, as he must, that the evidence that Kelly had unpaid construction debt of $89,000 is a part of the bank fraud and false statement charges, and is thus admissible.  Makras writes in his motion in limine, "*the only 'part' of the foregoing evidence the government needs for the bank fraud case is the fact that Mr. Kelly accrued a liability to a construction contractor that the government - but not the defendants - concede was not disclosed to Quicken.*"  *Dkt. 81,* 7:9-11.

What defendant Makras objects to is admission of any evidence as to *why* Kelly did not disclose the unpaid construction debt to Quicken.  But it is the *why* the $89,000 construction debt was concealed and misrepresented that is crucial in explaining the rationale for the fraud.  Thus, the evidence is relevant and admissible as evidence inextricably intertwined with the bank fraud charges.

The government seeks to introduce evidence that this construction work was done by a contractor name Walter Wong, whose company did extensive construction and remodel work on Kelly's house over a 10-month period.  The government's evidence will show that Wong embarked on this work with no estimate or scope of work, no bill, no deposit, and no advance payment for materials or costs from Kelly.  The government's evidence is that Wong only billed Kelly for the work after Kelly's loan

1   with Quicken had been approved, and that Wong significantly underbilled Kelly for the work.  And the

2   government will show that Wong did this for a reason; that his company hoped to bid on an upcoming

3   multi-million contract to install "smart" LED lights on city streets that the PUC had just put out for bid

4   (known as a Request for Proposal, or RFP), and he believed that Kelly, as head of the PUC, could help

5   him.  Finally, the government's evidence is that Kelly knew that Wong was interested in the LED lights

6   contract, texting Wong on September 21, 2014, referencing both the contract work and the RFP the PUC

7   had just issued: "*Btw, my loan was approved.  We need to get together to chat how to reimburse you and*

8   *rfp. I should get the money in three weeks*."

9         These facts are necessary to explain why Kelly would not—in fact, could not—have disclosed

10  the construction debt to Quicken as required.  Had Kelly disclosed the debt to Quicken, Quicken would

11  have conducted due diligence, asking questions about the source of the debt, seeking records of the

12  contract, the estimates, and whether payments had been made.  Kelly could provide none of this to

13  Quicken, so he enlisted Makras to help him conceal the debt by falsely claiming that Kelly owed Makras

14  the money.

15        To exclude this evidence is to allow the defendant to keep from the jury a fundamental rationale

16  for the conspiracy.  It denies the government its right to present evidence that explains the subterfuge

17  and false representations to Quicken, and thus "constitutes a part of the transaction that serves as the

18  basis for the criminal charge" or "is necessary . . . to permit the prosecutor to offer a coherent and

19  comprehensible story regarding the commission of the crime."  *United States v. Vizcarra-Martinez*, 66

20  F.3d 1006, 1012-13 (9th Cir. 1995).  Excluding this relevant evidence leaves the government unable to

21  explain a central motive behind the bank fraud and false statements schemes.

22        b.  EVEN IF THIS EVIDENCE IS 404(B), IT IS ADMISSIBLE TO SHOW MOTIVE, INTENT, AND LACK
            OF MISTAKE OR ACCIDENT
23

24        Even if the Court views some of the construction debt evidence as other act evidence under Fed.

25  R. Evid. 404(b), it is nonetheless admissible to show Kelly's motive and intent in conspiring with

26  Makras to make false representations to Quicken, and to prove that their false statements to Quicken

27  were neither mistake or accident.

28

To be admitted, 404(b) evidence must; 1) prove a material point; 2) not be too remote in time; 3) there must be sufficient proof for the jury to find the defendant committed the other act; and 4) in cases where it's being used to prove intent, the acts must be sufficiently similar to the charged conduct. *United States v. Lague,* 971 F.3d 1032, 1038 (9th Cir. 2020), *citing United States v. Bailey*, 696 F. 3d, 794, 799 (9th Cir. 2012).  The Ninth Circuit has explained that Rule 404(b) is "a rule of inclusion" and that there is a "low threshold test" for the sufficiency of the evidence for admission.  *Lague*, 971 F.3d at 1038*, citing United States v. Curtain*, 489 F.3d 935, 944 (9th Cir. 2007), *United States v. Dhingra*, 371 F.3d 557, 566 (9th Cir. 2004).

The conduct is not remote in time.  To the contrary, the unpaid $89,000 construction debt is outstanding throughout the period that Kelly and Makras are seeking to refinance Kelly's mortgages and other debts through Quicken Loans, all in the fall of 2014.

Nor is the evidence insufficient.  Sufficient evidence is such that could lead a jury "to reasonably conclude that the [other] act occurred and that the defendant was the actor."  *United States v. Hinton*, 31 F.3d 817, 823 (9th Cir. 1994).  Sufficient proof exists for the jury to find the other act merely from the testimony of witnesses.  *United States v. Hadley*, 918 F.2d 848, 851 (9th Cir. 1990).   Here, the government will present witness testimony, primarily from Wong, as well as documents, showing that Wong performed extensive construction work for the Kellys, and underbilled them, all while preparing to bid on the PUC contract, and that he did so in order to curry favor with Kelly, who led the PUC, which was overseeing and issuing the contract.

### c.   This Evidence is Not Unfairly Prejudicial to Defendant Makras

Makras claims that regardless of its relevance, he had no knowledge of Kelly's construction debt, nor his corrupt relationship with Wong, and thus admission of the evidence does not prove his participation in the conspiracy, and is unfairly prejudicial under Fed. R. Evid. 403.

First, the evidence as to the extent of Makras' knowledge, or lack thereof, of Kelly's construction debts is not as clear-cut as the defendant claims.  The evidence the government intends to introduce will show that Kelly had borrowed $715,000 from Makras to finance his home construction.  The evidence will further establish that, when Kelly was seeking to pay off that debt and another mortgage with a $1.3

million loan from Quicken, Kelly asked Makras to draft and submit to Quicken a document claiming that Kelly had borrowed an additional $200,000 from Makras.  In a text to Makras asking him to create this false document, Kelly claimed he needed the additional $200,000 "*for money paid and money owed.*"  Makras complied, submitting documents to the title company, for use in the Quicken loan application, that Kelly owed Makras $915,000 in a mortgage on Kelly's property.

Nonetheless, Makras asserts that he did not know Wong, and did not know that Wong was seeking business with the City of San Francisco.  It does not follow, however, that the jury is not entitled to hear evidence of Kelly's motive as one piece in the evidentiary chain establishing that there was in fact a conspiracy between Kelly and Makras to commit bank fraud. Evidence of one co-conspirator's motives for entering a conspiracy is admissible against other conspirators to prove the existence of a conspiracy.  *See United States v. Testa*, 548 F.2d. 847, 851 (9th Cir. 1977) ("acts by others . . . before or after the conspiracy may be relevant in suggesting the existence and aims of the conspiracy charged."); *United States v. Sierra*, 892 F.2d 84 (9th Cir. 1989).

Courts in this circuit and others have repeatedly emphasized that evidence that is otherwise relevant and admissible may only be excluded when the potential for unfair prejudice substantially outweighs the probative value of the evidence.  *See United States v. Skillman*, 922 F.2d 1370, 1374 (9th Cir. 1990).  Mere prejudice to the defendant is not enough; the evidence must be unfairly prejudicial. *United States v. Blitz*, 151 F.3d 1002, 1009 (9th Cir. 1998).  As the court noted in *Blitz*, quoting *United States v. Parker,* 549 F.2d. 1217, 1222 (9th Cir. 1977), evidence "'is not rendered inadmissible because it is of a highly prejudicial nature .... [t]he best evidence often is.'"  Only evidence that "'has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one'" is considered "unfairly" prejudicial.  *Skillman*, 922 F.2d at 1374.

The correct course for the Court is not to exclude this relevant evidence.  Rather, it is for the Court to admit the limited evidence above, and for defendant Makras to argue that he was unaware of this motive and was thus not a knowing participant in the conspiracy.  With a proper limiting instruction, this is a question the jury can and should decide.

      c.  THE GOVERNMENT DOES NOT SEEK TO ADMIT MOST OF THE HONEST SERVICES FRAUD EVIDENCE

1    The government's separate honest services fraud charges against defendant Kelly encompass the

2    $89,000 construction work on Kelly's residence, but extend much farther, including allegations that

3    weeks and months after the construction work was completed, Kelly provided Wong with internal PUC

4    documents regarding the PUC contract, and that Wong provided additional benefits to Kelly, including

5    the payment of expenses during a trip to Hong Kong, and later repair work on Kelly's residence.  *See*

6    *Dkt. 64* (Superseding Indictment).  Defendant Makras claims that he will be forced to defend against all

7    of these allegations related to the PUC contract, arguing in his motion that the admission of any

8    evidence Wong sought to bid on a future PUC contract would force Makras "to delve into that

9    procurement process, if the Court permits the identified honest services fraud evidence, to contextualize

10   Mr. Kelly's interactions with Mr. Wong. . . . [t]he result would be a trial-within-a-trial - on a matter that

11   Mr. Makras had nothing to do with."  *Dkt. 81*, 9:21-24.

12   This a red herring.  The government does not need to, nor does it intend to, introduce evidence

13   about Mr. Kelly's long-running corrupt relationship with Mr. Wong regarding the PUC contract, which

14   was in fact put out for bid multiple times over the course of almost two years.  In fact, the government

15   does not need to introduce any more of the PUC evidence than simply that the PUC had put out a

16   contract for bid in September 2014, during the conspiracy period, and that Wong was performing

17   construction work on Kelly's residence in the hope of future help from Kelly with the PUC contract.

18   Specifically, the government seeks to introduce evidence to prove the following: 1) During the

19   conspiracy period, Walter Wong was a contractor who ran entities that did or sought business with the

20   PUC;  2) Kelly hired Wong to perform extensive construction work on Kelly's residence; 3) By

21   September 2014 Wong had substantially completed the work, but had not been paid, or provided Kelly

22   with an estimate or bill;  3) At this time, Wong was seeking to bid on an upcoming PUC contract to

23   provide LED lights to the city; and, 4) In September 2014, the PUC put out a request for bids for the

24   PUC lights contract Wong was seeking to bid on.

25   None of the above, limited facts, are unduly prejudicial, nor will they result in a trial-within-a-

26   trial.  Rather, they provide the necessary context and understanding for the unpaid $89,000 construction

27   debt, and why it was concealed from Quicken.  As such, the government respectfully asks that the Court

28   admit this evidence, and provide as necessary limiting instructions.

III.   **DEF. MOTION IN LIMINE NO. 2: EVIDENCE OF KELLY'S FILED STATEMENTS OF ECONOMIC INTERESTS (FORM 700S)**

a.   CO-DEFENDANT KELLY'S STATEMENTS OF ECONOMIC INTEREST ARE ADMISSIBLE AS EVIDENCE THAT KELLY AND MAKRAS' REPRESENTATIONS TO QUICKEN WERE FALSE

The defendant next objects to the government's proposed introduction of the publicly-filed Statements of Economic Interest (Form 700s) of co-defendant Kelly covering the time period of the charged scheme and conspiracy, and expert testimony on their contents and requirements.

The Form 700s would show that co-defendant Kelly never disclosed a $915,000 mortgage loan with Victor Makras on his forms, as he would have been required to do had he in fact had a $915,000 mortgage loan with Victor Makras.  This is evidence that a jury could use to conclude that the assertion to Quicken Loans, by both Kelly *and Makras*, that Kelly had a $915,000 mortgage loan with Makras, was false.  The Form 700s are filed publicly and subject to scrutiny; Kelly would put himself at risk professionally and legally were he to falsely disclose a loan he did not in fact have. The fact that he did not disclose it can go to show that what Kelly and Makras then disclosed privately to Quicken Loans was therefore false. This evidence is inextricably intertwined with the alleged false and fraudulent statements because it is evidence that tends to show the misrepresentations and concealments at the heart of the bank fraud charges were false.  As such, it should be admitted.

Defendant Makras claims that he had no knowledge of Kelly's Form 700s or what Kelly filed on them, and that makes their admission unfairly prejudicial to Makras.  But that does not make the evidence irrelevant.  The Form 700 statements are circumstantial evidence that the statements made by Kelly *and Makras* to Quicken that Kelly had a $915,000 mortgage loan with Makras were knowingly false.  Makras may argue that he did not act with an intent to mislead and deceive Quicken when he agreed to falsely claim to Quicken that Kelly in fact had a $915,000 loan from Makras, and he is entitled to make those arguments.  But the jury, in weighing Makras' defense, is entitled to hear evidence that a co-conspirator had taken steps that tend to show that Kelly and Makras' statements to Quicken were false.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

  b. SF Ethics Expert Commission Expert Testimony is Admissible under 404(b) to Show Motive and Intent for The False Statements and Representations to Quicken

  The government's proposed ethics expert will next testify that defendant Kelly was prohibited from soliciting or accepting any gift or loan from a person Kelly knew was doing business with or seeking to do business with the PUC, which Kelly led.  This evidence explains in part why Kelly sought to conceal his relationship with Wong by enlisting Makras to falsely claim that the money was owed to him, and enlisting Makras to agree to then pay Wong out of the proceeds from the Quicken Loan.  Kelly *and Makras* created a complicated subterfuge to conceal Kelly's financial entanglement with Wong. Understanding why they would do that goes directly to the motive for the fraud, and it is evidence the jury is entitled to consider.

  Finally, the SF Ethics Commission expert will testify that the $70,000 interest-free loan defendant Makras provided to Kelly should have been disclosed.  Kelly's concealment of the $70,000 personal loan on his Form 700s is inextricably intertwined with the charged offenses.  It will be offered to prove that Kelly and Makras intentionally lied on Kelly's Quicken Loan application when they both claimed Kelly had a $915,000 mortgage lien with Victor Makras in which he paid $4,766 a month in interest, even though both knew that this was false.  If this Makras loan was indeed legitimate and structured as Kelly and Makras claimed on Kelly's Quicken loan application, Kelly would have disclosed it as such on his Form 700, as he would have been required to do.

  Kelly's Form 700s are also admissible under Fed. R. Evid 404(b) as evidence of Kelly's motive and intent in falsely characterizing his debt to Makras on the Quicken loan application.  The jury in this case is entitled to evidence he did not disclose the Makras loan or $70,000 advance on his Form 700 filed in March 2014, to prove his intent to deceive in misrepresenting the loan to Quicken, and to show that the misrepresentations were neither accident nor mistake.  This is a reasonable inference that the jury should be allowed to draw from Kelly's Form 700s.  "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind, and the only means of ascertaining that mental state is by drawing inferences from that conduct."

*Huddleston*, 485 U.S. at 687. This is because the Government must affirmatively prove by direct evidence that the defendant intended the consequences of his actions. *See e.g., United States v. Gruttaduro*, 818 F.2d 1323, 1327-28 (7th Cir. 1987).

Makras again claims this evidence is unfairly prejudicial to him because he did not know what Kelly did or did not disclose on his Form 700s. But again, the evidence is relevant because it goes to show part of Kelly's motives to conspire with Makras to conceal the $70,000 debt from Quicken. Makras may argue that he did not act with an intent to mislead and deceive Quicken, and he is entitled to make those arguments. But the jury, in weighing Makras' defense, is entitled to hear evidence that Makras' co-conspirator Kelly was taking actions that show that the statements to Quicken were false.

## IV.    DEF. MOTION IN LIMINE NO. 3: EVIDENCE OF KELLY'S SUPPORT FOR MAKRAS

Makras moves in his third motion *in limine* to exclude evidence "related to Mr. Makras' election as president of SFERS." *See* Dkt. 81 at 8-9. The motion should be denied: That evidence is relevant to motive and not unduly prejudicial.

On June 12, 2013, Makras was elected president of SFERS in a unanimous vote of the commission's seven members. A day later, on June 13, Makras texted Kelly: "*Thanks you for all Your help and support at SFERS.*" Kelly wrote back, "*What happen? I am returning from 2 days at hetchy.*" Makras then described the vote, texting, "*7-0 Makras president 4-3 supervisor Cohen vice president.*"

Makras' text to Kelly captures the advantage to Makras from a favorable relationship with Kelly. Presidency of the SFERS carried status and power, and Makras' thank-you to Kelly conveyed both that Makras valued that status and that Kelly had a hand in elevating Makras to it. The messages are therefore relevant to the charged offenses as evidence of motive and not unduly prejudicial. The government intends to argue to the jury that Makras conspired with Kelly in part to preserve a relationship with a powerful public official—a relationship that, as Makras' text message makes clear, had already borne fruit in the form of help securing a plum commission presidency.

The Ninth Circuit has repeatedly upheld the admission of motive evidence in criminal cases despite the fact that such evidence may prejudice a defendant. *See*, *e.g.*, *United States v. Parker*, 549 F.2d 1217, 1222 (9th Cir. 1977) ("[E]vidence relevant to a defendant's motive 'is not rendered

1   inadmissible because it is of a highly prejudicial nature. . . . The best evidence often is.'"), *United States*

2   *v. Holden*, 625 F. App'x 316, 318 (9th Cir. 2014) (in health care fraud case, district court properly

3   admitted evidence of defendant's salary and business draws "as relevant to motive, not as general

4   evidence of [defendant]'s wealth.").

5          Here, any prejudice does not substantially outweigh the probative value of Makras' expression of

6   gratitude to Kelly, to whom Makras lent $70,000 interest-free six months later and on whose behalf

7   Makras later made false statements to Quicken Loans.  Makras claims that the message would "beget a

8   lengthy and irrelevant side-trial," Dkt. 81 at 13:10, about Makras' service on SFERS.  Not so: What

9   matters about the text message is that Makras felt indebted enough to send it and believed at the time

10  that Kelly had "help[ed] and support[ed]" Makras to become president of San Francisco's public

11  retirement board.  The jury can glean all that from the message itself—information about "the rules and

12  procedures of [SFERS] elections" and "any similar thank you messages Mr. Makras sent," *see* Dkt. 81 at

13  13:10-15, is beside the point. The Court should admit the evidence.

14  **V.     DEF. MOTION IN LIMINE NO. 4: EVIDENCE OF KELLY'S FAVOR TO "J.M."**

15         Defendant Makras moves in his fourth motion *in limine* to exclude evidence "related to Mr.

16  Kelly's Purported Assistance to J.M."  *See* Dkt. 81 at 9-10.  The motion should be denied: That evidence

17  is relevant and not unduly prejudicial.

18         On November 21, 2013, defendant Makras got an e-mail from one John McInerney.  "I need a

19  favor from Harlan Kelly," McInerney said, "and don't know him well enough to ask him."  McInerney

20  described his situation: In essence, he wanted Kelly to agree in writing with McInerney's interpretation

21  of a statute—an interpretation that would ease development of a project on San Francisco's Larkin

22  Street.  "It would be of GREAT assistance," McInerney wrote, "[I]f I had a letter from Harlan . . . .  Do

23  you think this is something Harlan would be willing to do?  If so, then I can . . . expedite our discussions

24  with the Deputy City Attorney and Judge Beeler."

25         Makras, it seems, took the matter up with Kelly: On Friday, November 29, a week after

26  McInerney's e-mail, Makras sent Kelly a text message referencing McInerney's "*[e]mail to you on the*

27  *Request we spoke About on we'd* [sic]."  "*Yes, I got it*!" Kelly replied, "*Will issue letter on Monday.*"

28

1   Monday came and went, and Makras poked Kelly the following day: "*Can you check and see If you got*
2   *the mc Inerney email and if It was issued? Thanks*."  "*I got it and will be issue in the morning*," Kelly
3   replied.

4          Critically, Makras sent these messages just as he was also agreeing to pay $70,000 in credit card
5   bills for Kelly and his wife.  Indeed, in the *very same message* where Makras told Kelly that McInerneny
6   sent his request, Makras agreed to "*get the check ready*" for the $70,000 that Kelly wanted.  The nature
7   and timing of these communications demonstrate the interest that Makras had in his relationship with
8   Kelly, and the lengths to which Makras went to preserve that relationship.  The jury should hear that
9   Makras previously sought favors from Kelly contemporaneously with lending him tens of thousands of
10  dollars.  That prior act evidence helps to contextualize Makras' agreement to assist Kelly in the
11  refinancing of his mortgage, including by making false statements about that mortgage.

12         The Court should not preclude the evidence under Rule 403: The light shed on Makras' motive
13  by lobbying for McInerney is not substantially outweighed by the danger of unfair prejudice.  Makras
14  writes off his role as "incidental," Dkt. 81 at 14:3-4, but that belies the fact that McInerney's e-mail
15  suggests he would not have sought the favor from Kelly *but for* the relationship that Makras had with
16  Kelly.  (It also overlooks the fact that Makras reminded Kelly at least twice about McInerney's request.)
17  Moreover, the episode is *not* distant in time from the charged offenses:  Rather, it shows Makras leaning
18  on Kelly to help an industry contact just as the obligation at the heart of the charged offenses arises.  Nor
19  will admitting the evidence entail the seminar on real estate law that Makras seems to envision.  *See* Dkt.
20  81 at 14:12-16 (suggesting that evidence would require testimony about "how the exemption process
21  works, [and] who has the authority to issue exemptions").  The point is that Makras got a chit with an
22  industry contact by leveraging his relationship with Kelly.  That's relevant to *why* Makras would later
23  shepherd Kelly's refinance and make false statements to Quicken Loans.  The evidence should be
24  admitted.

25  **VI.    DEF. MOTION IN LIMINE NO. 5: THE GOVERNMENT IS ALLOWED TO USE THE WORD, OR A
26          FORMULATION OF THE WORD,S "BACKDATING" OR "BACK DATED"**

27         Defendant Makras moves in his fifth motion *in limine* to preclude reference to the term
28  "backdated" at trial.  *See* Dkt. 81 at 10-12.  The motion should be denied: The question, whether Makras

1   "backdated" a document purporting to amend Kelly's mortgage, is one for the jury.

2          Makras' motion stems from a document titled "Straight Note-Modification" that Makras created

3   at Kelly's request in or around late April 2014.  The document's title appears at the top of the page,

4   immediately adjacent to a date: December 2, 2013.  Below that header appears a series of terms

5   purporting to amend the "Original Note dated September 10, 2012."  The Kellys names'—and, in the

6   executed version, signatures—appear below.  The Kellys signed the document in or around May 1,

7   2014—shortly after receiving the document from Makras and a few days after Kelly sent Makras the

8   following text: "*Victor, I wanted to cash out 200K. This amount is for [sic] pay for money received and*

9   *money owed and pay off [NK] student loan. If you can put in a note saying I owe you it all good! We can*

10  *move forward.*"  *See* Dkt. 64 ¶ 8i.

11         The Court should not preclude use of the term, "backdated," to describe the "Straight Note-

12  Modification" for several reasons.  First and foremost, the word "backdate" accurately describes what

13  transpired here.  Black's Law Dictionary defines "backdate" to mean, "put[ting] a date earlier than the

14  actual date on (something, as an instrument)."  BACKDATE, Black's Law Dictionary (11th ed. 2019).

15  Here, the actual date of the document's creation and execution was months after the date that Makras

16  listed on the document's header.

17         Second, Makras' claim—that the "Straight Note-Modification" dated December 2, 2013 simply

18  purported to date Kelly's "line of credit" to its first draw—is very much in dispute.  The *only* date (other

19  than an expiration term and a reference to the original note) that Makras included on the "Straight Note-

20  Modification" was December 2, 2013—notwithstanding the fact that the Kellys executed the document

21  in May 2014. So Makras' "Straight Note-Modification" creates the unmistakable but false impression

22  that the Kellys signed in December 2013.  Moreover, that $70,000 payment that Makras made for Kelly

23  on December 2, 2013 came with *none* of the terms purportedly reflected in the "Straight Note-

24  Modification": When Makras and Kelly communicated about the payment in December 2013, there was

25  no mention of "amend[ing]" the 2012 mortgage.  Kelly didn't pay interest on the $70,000, as the

26  "Straight Note-Modification" required.  And he didn't give Makras fifteen days' notice.  To suggest that

27  the date on the "Straight Note-Modification" simply identified Kelly's first "advance" is to ask the court

28  and the jury to simply disregard these facts which are very much in dispute, and are entitled to go before

1  a jury.

2  Makras' other arguments to preclude the term, "backdating," lack merit.  Contrary to Makras'

3  motion, *see* Dkt. 81 at 11:14-23, the question whether Makras and Kelly misrepresented the terms of an

4  obligation *is relevant* to the charged offenses.  At minimum, a knowing misrepresentation about the date

5  on which an obligation arose bears on the question whether Makras made a knowing false statement to a

6  bank.  *See* 18 U.S.C. § 1014.  The fact that Quicken may have had in its possession *other* documents, *see*

7  *id*. at 11:21-23, does not make a statement that has a natural tendency to influence somehow

8  immaterial—nor does it render a false statement true.

9  Nor is it unduly prejudicial to examine witnesses and argue about "backdating" in a bank fraud

10  case where the document allegedly "backdated" was created five months after an obligation arose, at the

11  moment that Kelly's mortgage broker wanted to lock in a rate, and at the insistence of Kelly, who asked

12  Makras to "put in a note."  Makras' claim that "there is nothing wrong with the way the note

13  modification was dated," Dkt. 81 at 11:26-27, is pure *ipse dixit*.  The government will argue—and the

14  jury should be allowed to consider—that Makras backdated the document to conceal the fact that on the

15  eve of refinancing, Kelly wanted to gin up another $130,000 in purported mortgage debt to grease the

16  wheels of his construction project.

17  Finally, there's no basis to tie the government's hands with respect to its description of what

18  Makras wrote in the "Straight Note-Modification."  *See* Dkt. 81 at 16:3-7.  The government's view of

19  the evidence is that Harlan Kelly had not in fact modified his September 2012 mortgage as of December

20  2, 2013.  To bind the government to terms like "retroactive" is tantamount to directing a finding of fact

21  on an issue very much in dispute when no evidentiary foundation for that finding has yet been laid.

22  The Court should deny Makras' motion to preclude reference to backdating.

23

24

25  ## V.    CONCLUSION

26  For the foregoing reasons, the United States respectfully asks the court to deny defendant

27  Makras' motions *in limine* one through five.

28

U.S.' OPP. TO DEFS. MOTIONS IN LIMINE  13
21-CR-0402 RS

1    DATED:  July 15, 2022                              Respectfully submitted,

2                                                       STEPHANIE M. HINDS
                                                        United States Attorney
3

4                                                       /s/ David J. Ward
                                                        DAVID J. WARD
5                                                       ZACHARY G.F. ABRAHAMSON
                                                        Assistant United States Attorneys
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28