KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
JAN NIELSEN LITTLE - # 100029
jlittle@keker.com
CODY GRAY - # 310525
cgray@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant VICTOR MAKRAS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      v.<br><br>VICTOR MAKRAS,<br><br>            Defendant. | Case No. 3:21-cr-00402 RS<br><br>**DEFENDANT VICTOR MAKRAS' REPLY IN SUPPORT OF MOTIONS IN LIMINE**<br><br>Date:        July 27, 2022<br>Time:       10:00 a.m.<br>Dept.:       Courtroom 3 – 17th Floor<br>Judge:      Hon. Richard Seeborg<br><br>Date Filed: October 19, 2021<br><br>Trial Date: August 15, 2022 |

Through his five targeted motions *in limine*, Mr. Makras seeks to prevent an unfair trial of "guilt by association." What the government's opposition makes clear is that that is exactly what it hopes to achieve: in just 12 pages, the government mentions *Mr. Kelly* no fewer than **134** times. It says that it wants to explain to the jury that "*Kelly* would not—in fact, could not—have disclosed the construction debt" to Quicken, *see* Dkt. 93 ("Opp.") at 3:9–10. It hopes to argue that irrelevant Form 700s, which Mr. Makras neither saw nor knew about, were "evidence of *Kelly's* motive and intent in falsely characterizing his debt," *id.* at 3:21–22. And it wants to introduce evidence "that Wong significantly underbilled *Kelly* for" construction work. The government never claims, nor could it argue, that Mr. Makras knew any of these facts. And yet, it hopes to invite the jury to suspect that he did, or to conclude that if Mr. Kelly intended to defraud Quicken Loans, so too did Mr. Makras. That is textbook "undue prejudice." The Court has already severed the defendants' trials to "ensure Makras' trial is fair to him."[1] It should grant these motions *in limine* for the same reason.

## I.   MIL NO. 1: MOTION TO EXCLUDE HONEST SERVICES FRAUD EVIDENCE

Although the defendants' trials have now been severed, the government refuses to update its strategy. Before, its goal was to tarnish Mr. Makras by trying him alongside Mr. Kelly; now, it hopes to achieve the same end by introducing a broad swath of irrelevant and improper evidence under Rule 404(b).

With respect to Mr. Makras' first motion *in limine*, the parties agree on two things:

First, that Rule 404(b) evidence is admissible *only* to the extent it is "inextricably intertwined with the bank fraud charges." Opp. at 2:22–23; *id.* at 4:1–4 (recognizing that Rule 404(b) evidence *must* "prove a material point," "not be too remote in time," must be of an act committed by the defendant, and for intent purposes, must be "sufficiently similar"); Dkt. 81 ("Mot.") at 2:26–3:2.

Second, that the government must prove that Mr. Kelly accrued a construction liability, which (according to the government) he subsequently failed to disclose to Quicken Loans. *See* Mot. at 3:9–12; *see* Opp. at 2:9–14 (arguing that "evidence" of an "unpaid construction debt is

---

[1] Dkt. 79 (Order Granting Renewed Motion to Sever), 3:9–12.

inextricably intertwined with the bank fraud and false statements to the bank charges").

The parties disagree, however, about a sideshow of evidence that is irrelevant in *this* trial. As the government explains in its opposition, it hopes to put Walter Wong on the stand to testify that he "underbilled Kelly" for construction work because he hoped to "curry favor with Kelly" in connection with an upcoming PUC bid. Opp. at 4:15–19. This is what the government calls "the why" of this case—although, as the government acknowledges, it is at most *Mr. Kelly*'s "why," ***not*** Mr. Makras'. *See id.* at 2:20–21 ("What defendant Makras objects to is admission of any evidence as to *why* Kelly did not disclose the unpaid construct debt to Quicken."); *see also id.* at 3:9–10 (arguing that "[t]hese facts are necessary to explain why Kelly" could not "have disclosed the construction debt to Quicken"). To be clear, there is no allegation that Mr. Makras was aware of these alleged Wong–Kelly dealings, and the government does not claim that Mr. Wong will or could testify about *Mr. Makras'* knowledge or motives. This evidence must be excluded for several reasons.

First, as Mr. Makras has explained, it is not "inextricably intertwined" with the bank-fraud and false-statement counts. Oddly, the government acknowledges this standard but makes no attempt to meet it. Opp. at 2:22–23. Perhaps the closest it comes is its suggestion that Mr. Wong's testimony and related evidence would help "explain why *Kelly* would not … have disclosed the construction debt to Quicken as required." *Id.* at 3:9–10. But this is not Mr. Kelly's trial, and a co-conspirator's alleged motives are hardly "inextricably intertwined" with the charged transaction in *this* case. Mot. at 2:26–8.

Second, as the government recognizes, Rule 404(b) evidence must do more than simply "prove a material point"; it must be sufficient for the jury to "reasonably conclude" both "that the [other] act occurred and that *the defendant* was the actor." *See* Opp. at 4:12–15 (citing *United States v. Hinton*, 31 F.3d 817, 823 (9th Cir. 1994)) (emphasis added). Here, Mr. Makras wasn't even aware of the "other acts" the government hopes to squeeze in via Rule 404(b).[2] There is

---

[2] Although the government argues, in passing, that "the evidence as to the extent of Makras' knowledge, or lack thereof, … is not as clear-cut as the defendant claims," Opp. at 4:24–25, it never backs that contention up with factual support. Instead, it reverts to allegations that relate, if anything, to whether Mr. Makras knew that the loan was related to a construction project. *Id.* at 4:26–5:5 (claiming that the government "will show that Kelly had borrowed $715,000 from

1  certainly no suggestion that Mr. Makras, the defendant, was "the actor." *See generally* Mot. at
2  4:15–5:5 (explaining that the government's evidence does not go to any permitted purpose *as to*
3  *Mr. Makras*).  For that reason, too, this evidence is inadmissible under Rule 404(b).

4         Third, even if evidence about Mr. Kelly's interactions with Mr. Wong were admissible,
5  whatever probative value it might otherwise have would be outweighed by the risks of unfair
6  prejudice.[3]  The government hopes to tarnish Mr. Makras by shoehorning its honest-services
7  allegations into Mr. Makras' trial.  Indeed, it goes so far as to argue that the Kelly–Wong
8  interactions, which Mr. Makras knew nothing about, were somehow the "*central motive* behind
9  the bank fraud and false statement schemes." Opp. at 3:20–21.  The government has charged
10 Mr. Makras in various fraud and conspiracy counts; now, it must prove its case, which includes
11 proving that *Mr. Makras* intended to defraud Quicken Loans.  It cannot do that by pointing to
12 Mr. Kelly's motives, or an even-vaguer "rationale for the conspiracy," *id.* at 3:15–16.  There is
13 too great a risk that, if presented with evidence about Mr. Kelly's motives, the jury might
14 improperly impute them to Mr. Makras.  That may well be the government's goal.  *Id.* at 5:7–11
15 (explaining the government's desire to argue that "evidence of *Kelly*'s motive" is a "piece in the
16 evidentiary chain" establishing that Mr. Makras conspired to commit bank fraud).

17        This disputed evidence is voluminous, *see* Dkt. 75 at 14:6–6, and irrelevant in *this* trial,
18 where no one has argued that Mr. Makras was aware of these allegations.  It is inadmissible under
19 Rule 404(b) and unduly prejudicial under Rule 403.  It must be excluded.

20 **II.   MIL NO. 2: MOTION TO EXCLUDE EVIDENCE RELATED TO MR. KELLY'S**
21       **FORM 700 DISCLOSURES**

22        Here, Mr. Makras seeks to exclude evidence related to an annual "statement of economic
23 interest," or "Form 700," that Mr. Kelly was required to submit on an annual basis.
24 To be clear, there is ***no*** allegation or argument that Mr. Makras (1) had any obligation to submit

---

Makras to finance his home construction").  There is no dispute between the parties that *that* evidence—evidence about *Mr. Makras'* knowledge—is appropriate.

[3] There is a separate basis to exclude this evidence under Rule 403: it would result in a complicated "trial within a trial" on a "matter that Mr. Makras had nothing to do with."  *See generally* Mot. at 5:14–28.  The government has no response to that argument.  Opp. at 6:25 (asserting without any explanation that the Wong evidence will not require a trial-within-a-trial).

3
DEFENDANT VICTOR MAKRAS' REPLY IN SUPPORT OF MOTIONS IN LIMINE
Case No. 3:21-cr-00402 RS

1876915

such a form, (2) had any role in preparing Mr. Kelly's forms, (3) ever reviewed Mr. Kelly's forms, (4) had any knowledge about these forms, let alone their contents, or (5) had any knowledge about any 'gifts' Mr. Kelly may have received. Instead, the government wants to introduce these forms, and related expert testimony, to prove something about *Mr. Kelly*'s intentions, and then invite the jury to infer bad intent on *Mr. Makras*' part. *See generally* Opp. at 12–13 (arguing that a jury could "conclude," from the Form 700s, that "both Kelly and Makras" made false statements to Quicken Loans). As Mr. Makras has explained, none of this evidence "reflect[s] an act undertaken" by him. Mot. at 7:14–15. One need look no further than the government's opposition to confirm that fact. The government claims that *Mr. Kelly* "would [have] put himself at risk" by submitting inaccurate Form 700s, Opp. at 7:27–28; or that *Mr. Kelly* was barred from accepting loans from individuals who were "seeking to do business with the PUC," *id.* at 8:5–7; or that, if the loan at issue in this case was "legitimate," "*Kelly* would have disclosed it as such on his Form 700," *id.* at 8:18–20; or that the Form 700s are "admissible … as evidence of *Kelly*'s motive and intent in falsely characterizing his debt to Makras on the Quicken loan application," *id.* at 8:21–22. *Maybe*—but those theories should be resolved in the context of *Mr. Kelly*'s trial. This evidence does not belong in Mr. Makras' trial.

Even if the Form 700s were admissible, they should be excluded under Rule 403 because they are guaranteed to invite "unfair prejudice" and "mislead the jury." The government makes no effort to hide its ambitions here: it wants the jury to "infer" that (1) because *Mr. Kelly* failed to disclose the loan on his Form 700, he "inten[ded] to deceive" Quicken Loans, Opp. at 8:22–24, and (2) because *Mr. Kelly* "intended to deceive" Quicken Loans, so too did Mr. Makras, *id.* at 9:4–9. Faced with a dearth of evidence about *Mr. Makras*' intentions, the government wants to substitute in evidence of *someone else*'s intentions instead. That is an effort to "mislead the jury" by "confusing the issues," and as such, it is prohibited under Rule 403.

To justify this misdirection, the government complains that it is difficult for prosecutors to prove intent, and that they must often lean on "extrinsic acts evidence" because sometimes "the only means of ascertaining that mental state is by drawing inferences from conduct." Opp. at 8:25–28 (citing *Huddleston v. United States*, 485 U.S. 681 (1988)). But, as the next sentence of

the *Huddleston* opinion makes clear, those "extrinsic acts" should obviously be *the defendant's*: "The actor in the instant case was a criminal defendant, and the act in question was 'similar' to the one with which he was charged." *Huddleston*, 485 U.S. at 685. It is one thing to argue that a jury can draw inferences about *the defendant*'s intent from *the defendant*'s actions—as the prosecution did in *Huddleston*. *See generally id.* at 684 ("The District Court instructed the jury that the similar acts evidence was to be used only to establish petitioner's knowledge, and not to prove his character.") It is quite another to invite the jury to draw conclusions about *Mr. Makras'* state of mind based on *Mr. Kelly*'s actions, as the government proposes to do here. If the government hopes to prove Mr. Makras' intent, it should do so with evidence about Mr. Makras—not by muddying the waters with alleged acts that Mr. Makras had no knowledge of and no role in.

The Form 700s, and any related expert testimony, should be excluded.

### III.   MIL NO. 3: MOTION TO EXCLUDE EVIDENCE RELATED TO MR. MAKRAS' ELECTION AS PRESIDENT OF SFERS

Here, Mr. Makras seeks to exclude evidence related to his election as President of the San Francisco Employees' Retirement System ("SFERS") in June 2013. Specifically, the government intends to introduce evidence that, after the election, Mr. Makras texted Mr. Kelly to "thank" him for his "help and support." *See* Mot. at 8:14–19. The election, and the text exchange, took place almost *six months* before the alleged conspiracy even began. *See* SI ¶ 7 (alleging that the conspiracy began "in or about November 2013" and continued until "in or about April 2015). Although the government does not allege—and has proffered no factual basis to infer—that Mr. Kelly ever used his public position to benefit Mr. Makras in any way, it wants to use this text exchange to imply exactly that. *See* Opp. at 21–24.

In his motion, Mr. Makras set out three bases for excluding this evidence.

First, the exchange is not "inextricably intertwined" with the bank-fraud or false-statement offenses. Mot. at 8:20–26; *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012–13 (9th Cir. 1995). The government does not disagree.

Second, the evidence is not admissible under Rule 404(b). In its opposition, the

government concedes that it "intends to argue"—and will invite the jury "to glean"—that "Makras conspired with Kelly in part to preserve a relationship with a powerful public official." Opp. at 9:21–24.  (The government goes on to undermine its own hypothesis by arguing that their friendship had "*already* borne fruit" long *before* Mr. Makras made any loans to Mr. Kelly and long before the alleged conspiracy began.  *Id.*)  But, as Mr. Makras explained in his motion, the government needs more than its own say-so.  Mot. at 9:3–6; *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014)) (courts "should not just ask whether the proposed other-act evidence is relevant to a non-propensity purpose but how exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference").  Here, the government has not identified any factual basis to conclude that Mr. Kelly used his public position to help Mr. Makras in any way.  What it does instead is argue that the propensity evidence it proffers—the ten-word "thank-you" message—*is* the proof.  *See* Opp. at 9:18 ("Makras' text to Kelly captures the advantage to Makras from a favorable relationship with Kelly.").  Without more, and without a "propensity-free chain of reasoning," these texts must be excluded.  *Id.*

Third, even if this evidence *were* admissible under Rule 404(b), Mr. Makras has explained that it should also be excluded under Rule 403 to avoid a "lengthy and irrelevant side-trial…." Mot. at 9:9–16.  Again, the government has no response, other than to suggest that Mr. Makras' anticipated rebuttal arguments are "beside the point."  That is both right and wrong.  The rebuttal *is* beside the point because the *text messages* are beside the point—that is the nature of an unnecessary side-trial.  But the government is mistaken if it thinks that the "jury can glean all" it needs "from the message itself."  Opp. at 10:11–13.  If the government invites the jury to infer, from this simple text exchange, that Mr. Kelly somehow elevated Mr. Makras to his position as president, then Mr. Makras has no choice but to explain how SFERS operates, the rules and procedures of its elections, the extent to which Mr. Makras did (or could have) received meaningful "support" from Mr. Kelly, the extent to which he received similar support from others, thank-you messages he sent to others, and so on.

Because these messages are irrelevant, and because they would require a separate mini-

trial that even the government recognizes would be "beside the point," Mr. Makras requests that the Court grant his third motion *in limine*.

IV.  **MIL NO. 4: MOTION TO EXCLUDE EVIDENCE RELATED TO MR. KELLY'S PURPORTED ASSISTANCE TO J.M.**

Here, Mr. Makras seeks to exclude evidence related to Mr. Kelly's purported assistance to a third party, J.M. As Mr. Makras has explained, these interactions—that is, Mr. Makras' asking Mr. Kelly about a third-party's request for assistance—took place almost a full year before Mr. Kelly submitted any loan applications to Quicken. *See* SI ¶¶ 8l, 8q.

The government offers two tenuous theories of relevance.

First, it appears to believe that there was some sort of quid pro quo in November 2013: "in the *very same message* where Makras told Kelly that [J.M.] sent his request," the government argues, Mr. Makras also "agreed to 'get the check ready' for the $70,000 that Kelly wanted."[4] Opp. at 11:5–6 (emphasis in original). In other words, the government suggests, a jury might conclude that Mr. Makras was "motivated" to make a loan of $70,000 to Mr. Kelly because, in so doing, he was able to secure "assistance" for a friend. *Id.* at 11:8–10 ("The jury should hear that Makras previously sought favors from Kelly contemporaneously with lending him tens of thousands of dollars"). So what? The law is clear: "in introducing other act evidence, the government always must show … that the act tends to prove a ***material element*** or point…." *United States v. Preston*, 873 F.3d 829, 840 (9th Cir. 2017). Here, even if the government's theory were right—and Mr. Makras denies it—this "other act" evidence would relate to a loan made nine months before Mr. Kelly submitted any application to Quicken. It does not relate to any "material element or point" in the government's bank-fraud and false-statements case. It is thus inadmissible under Rule 404(b).

Perhaps realizing that its first theory fails, the government pivots to a second: that Mr. Makras was somehow "motivated" to "make false statements to Quicken" (in late ***2014***) to

---

[4] This is the same argument the government made in its Rule 404(b) disclosures: that these events occurred on the same day. *See* Dkt. 81-1 at 7 ("In his November 29, 2013 text (the same text where Makras agrees to pay $70,000 of Kelly's credit card debts), Makras writes 'Separate note, [J.M.] sent the email to you on the request we spoke about on we'd [*sic*].'").

secure a "chit" that he cashed in (in late *2013*) by "poking" Mr. Kelly to respond to an email. That makes little sense. If the government's theory is that Mr. Makras was willing to lie to Quicken *so as to* secure favors from Mr. Kelly, then, under Rule 404(b), it cannot rely on circumstantial evidence of alleged "favors" that had long come and gone before any such disclosures were made. It is the government's burden to "articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982). Here, it has failed to do so.

Of course, even if the government *could* demonstrate relevance, the evidence would still be admissible only if it also shows "that, on balance, its probative value is not substantially outweighed by the danger of unfair prejudice to the defendant." *Mehrmanesh*, 689 F.2d at 830; *Preston*, 873 F.3d at 840. On this point, the government has very little to say. Mr. Makras has explained how these emails would "confuse the issues" and "waste time," and he has set out the evidence he would need to introduce (and the arguments he would need to make) to put them in their proper context. *See* Mot. at 10:11–18. In response, the government simply asserts that it should be allowed to introduce its evidence without "the seminar on real estate law that Makras seems to envision." Opp. at 11:18–19. But Mr. Makras is entitled to defend himself. If the government intends to argue that Mr. Makras was "lobbying" for J.M., Opp. at 11:12–13, or that J.M. could not have got what he needed "but for the relationship that Makras had with Kelly," *id.* at 11:15–16, then Mr. Makras will need to provide the jury with evidence and testimony about how exemptions work, who has authority to issue them, and how and why an exemption was issued in this particular instance. There is no doubt that such a trial-within-a-trial would be time-consuming, and unnecessary but for the introduction of the J.M. texts. For that reason, the Court should grant this fourth motion *in limine*.

### V. MIL NO. 5: MOTION TO EXCLUDE USE OF THE TERM "BACKDATED"

Mr. Makras has moved to "exclude any reference to or use of the term 'backdated'" because it "evokes a sundry and/or criminal act...." Mot., 11:11–13.

As Mr. Makras has explained, the modification in question was agreed to in December 2013 and documented in May 2014, *see* Dkt. 64 ("SI") ¶ 8j. Mr. Kelly did not submit

his loan application to Quicken until September 2014. *Id.* ¶ 8m. The government's complaint—now, as in the Superseding Indictment—is that the *terms* of that modification were false. *Id.* ¶ 8n (alleging that Mr. Kelly "falsely stated that the Straight Note mortgage loan was amended to allow an additional advance up to $200,000, at the same 8% interest rate"); *see also* Opp. at 12:25–26 (arguing that Mr. Kelly "didn't pay interest on the $70,000"). The date is immaterial to the note modification terms the government challenges.

In any event, Mr. Makras is not trying to "tie the government's hands" here. *See* Opp. at 13:17. If the government wishes to argue or attempt to prove that it was improper to use an "as of" or retroactive date for the note, it is free to do so. But there is no need to use—and the government should be prohibited from using—an intentionally inflammatory term like "backdating." Although the government now argues that "the word 'backdate'" simply "describes what transpired here," it plainly knows that the word "backdating" invites real prejudice. Indeed, when faced with the prospect of having to use another equally descriptive but more neutral term, like "retroactive," the government goes so far as to suggest that that would be "tantamount to directing a finding of fact on an issue very much in dispute…." Opp. at 13:17–21. What, then, is the difference between these two synonyms?[5] As the government knows, jurors will almost certainly associate the word "backdate" with misconduct even before they hear or evaluate the evidence.[6] That is improper, especially in this case, where there is no evidence that the retroactive dating in any way affected the substance of any financial transaction, as would be the case with backdating a deductible expense to accelerate a tax benefit, or backdating stock options to inflate their value, or backdating sales documents to affect revenue recognition.

//

//

---

[5] Merriam-Webster's offers two definitions for the verb "backdate": "to put a date earlier than the actual one on"; or "to make retroactive."

[6] For example, searching the New York website (www.nytimes.com) for the words "backdate" and "backdating" returns a slew of negative headlines: "How backdating hurts stockholders"; "Study Finds Backdating of Options Widespread"; "Backdating Case Is Settled"; "Backdating Case Brings a Prison Term"; "Broadcom to Settle Backdate Suit for $160 Million"; "Former Apple Executive Settles Backdating Suit"; "Trial Starts for Former Chief in Options-Backdating Case"; and so on.

Mr. Makras requests that the Court exclude the use of the term, or any reference to, "backdating."

Dated: July 22, 2022				KEKER, VAN NEST & PETERS LLP

					By:	*/s/ John W. Keker*
						JOHN W. KEKER
						JAN NIELSEN LITTLE
						CODY GRAY

						Attorneys for Defendant
						VICTOR MAKRAS