UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>VICTOR MAKRAS,<br>Defendant. | Case No. 21-cr-00402-RS-2<br><br>**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL** |

## I. INTRODUCTION

The operative superseding indictment in this case charged defendants Victor Makras and Harlan Kelly jointly with having made false statements to Quicken Loans and having defrauded it in connection with a refinancing loan on a residence owned by Kelly and his wife. The superseding indictment also charged Kelly with certain other crimes in which Makras was not alleged to have participated. Makras' motion for a severance as between the two defendants was granted, and the matter proceeded to a jury trial on the charges against Makras. Kelly has yet to be tried.

The jury heard opening statements, evidence, and closing arguments for approximately five days. After instructions, the jury retired and deliberated for approximately three-and-a-half days before returning a guilty verdict on one count of making false statements to a bank and one count of bank fraud. The jury deadlocked on the other two counts, 10-2 in favor of conviction, which charged Makras with conspiring with Kelly to make the false statements and commit fraud.

Makras now moves for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure or, alternatively, for a new trial under Rule 33. The motion will be denied.

## II. LEGAL STANDARDS

In considering a motion for acquittal under Rule 29, the evidence must be viewed in the light most favorable to the government, all reasonable inferences drawn in the government's favor. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). *See also United States v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003) (the fact that inferences favorable to the defendant could also be drawn from the evidence is of no import because "the task of choosing among permissible competing inferences is for the jury, not a reviewing court"). A court may not view the government's evidence in isolation, but must examine that evidence as a whole. *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). Both direct and circumstantial evidence must be credited without evaluating or speculating on the weight a jury might give it. *United States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000). It is "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *AlarconSimi*, 300 F.3d at 1176, quoting *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977). The question "is not whether the evidence excludes every hypothesis except that of guilt, but rather whether the trier of fact could reasonably arrive at its conclusion." *United States v. Nevils*, 598 F.3d 1158, 1165 (9th Cir. 2010). If any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt, then the motion must be denied. *Id*. at 1164.

A district court has broader power to grant a motion for a new trial under Rule 33, and may weigh the evidence itself and judge the credibility of witnesses. *United States v. A. Lanoy Alston, D.M.D. P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992). Nonetheless, the defendant "bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant

to Rule 33, a district court must find there is a real concern that there has been a "serious miscarriage of justice." *Id*. If the court concludes that, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (quotation marks and citations omitted).

Rule 33 motions are generally disfavored and should only be granted in "exceptional" cases. *See United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981); *United States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012). *See also United States v. Camacho*, 555 F.3d 695, 705 (8th Cir. 2009) ("New trial motions based on the weight of the evidence are generally disfavored. . . .").

## III. DISCUSSION

### A. Proof of false statement or fraud

The primary thrust of Makras' motion is the same as his arguments before and at trial. In Makras' view, none of the statements or information presented to Quicken, whether by Makras, Kelly, or anyone else, were actually false or otherwise fraudulent. There is no dispute that in 2012, Kelley and his wife borrowed $715,000 from a group of private investors put together by Makras ("the investors). The loan was intended, at least in part, to fund a remodeling project the Kellys were carrying out at their residence.

The loan was evidenced by a "Straight Note," calling for interest at 8% per annum, and monthly interest-only payments in the amount of $4,766.66. The note was secured by the Kellys' house and several other properties they owned. See TX 1066 (straight note for $715,000), TX 1003 (deed of trust securing $715,000 loan). The expectation was that the Kellys would refinance the house when the remodeling project was complete, and pay off the investors.

In December of the following year, during the time the Kellys were starting to look for a refinancing loan, Makras offered them an additional $70,000 to pay down credit card debt, for the

purpose of improving Mrs. Kelly's credit score. Makras suggested he would personally pay the credit card companies himself rather than providing the funds to the Kellys, because "banks don't like seeing anything unusual about the flow of cash in or out of the checking and savings accounts. This will make the loan process go easy." TX 179. Makras did so, and never charged the Kelly's interest on the $70,000.[1]

As the due date of the Straight Note approached, Kelly sent Makras a text message stating: "Victor, I wanted to cash out 200K. This amount is for [sic] pay for money received and money owed and pay off [his wife's] student loan. If you can put in a note saying I owe you it all good! We can move forward." TX 127. Makras responded by providing a written modification to the Straight Note extending the due date and stating the Kellys could take additional advances up to $200,000 on the original loan. TX 2-331. Sometime thereafter, Makras prepared a revised "Straight Note" representing that the Kellys had modified the original note, and that the principal amount of the loan was now $915,000. TX 57.

Quicken ultimately approved and funded the loan, believing that the Kellys owed a total of $915,000 to the investors and "Makras Real Estate." Funds in that amount were disbursed to Makras, who ensured the investors were paid off (or their investments rolled into other properties). Makras insists it was completely true that the Kellys owed $915,000, given that they had signed the modified note in that principal amount. The evidence at trial was uncontroverted, however, that prior to the closing of the Quicken loan, the only funds that Makras or the investors had actually provided to the Kellys or on their behalf were (1) the original $715,000, and (2) the $70,000 in credit card paydowns. Instead, the $130,000 difference was provided to the Kellys by Makras *after* the Quicken loan closed through a series of checks Makras Real Estate issued to pay

---

[1] There was evidence that Makras or his firm frequently made interest-free short-term loans to clients, and there is nothing inherently wrong with doing so. The issue is the failure to disclose accurately to Quicken the existence and nature of that transaction. It also serves as evidence supporting a conclusion that Makras was working closely with Kelly in the process of obtaining what eventually became the Quicken loan and in ensuring that a lender did not obtain information that might have delayed or impeded loan approval.

off various third-party bills for the Kellys. The question, therefore, is whether against this largely uncontested factual backdrop, a rational jury could find that Makras "made a false statement" to Quicken, as necessary to support his conviction on both the false statement and bank fraud counts.

The government relies on four basic "statements" made by Makras. It argues:

> Makras made false statements when 1) Makras drafted for Kelly a false "straight note" which claimed the Kellys had a $200,000 line of credit with Makras Real Estate, 2) drafted a "payoff demand" claiming that the Kellys owed the Makras investors $715,000 and Makras Real Estate $200,000; 3) drafted a "modified note" that claimed that the Kellys had a $915,000 mortgage loan at 8% interest, and: 4) when Makras hand-wrote a Verification of Mortgage (VOM) that stated that the Kellys had a $915,000 mortgage loan.

Opp'n at 5:17–22.

Standing alone, neither the modification to the straight note stating the Kellys had a $200,000 line of credit, nor the subsequent modified note for the total $915,000 amount necessarily would support a finding of falsity. As to the "line of credit," the government points to no evidence tending to show that Makras and Kelly never intended for the Kellys to draw down on the additional $200,000 *before* the Quicken loan closed—as such, the document may have accurately stated the parties' arrangement at the time it was created.[2] Similarly, to the extent that Makras Real Estate could have ended up funding the additional $130,000 or $200,000 sometime after the modified note was signed and before the Quicken loan closed, it would not clearly have been "false." It is everyday practice to create and sign promissory notes in advance of the lender actually providing the funds.[3]

---

[2] Even that is problematic, however, given that Makras had already provided $70,000 to pay off credit cards. Makras contends that the $70,000 was part of the total $915,000 obligation the Kellys eventually incurred, and the parties in fact treated it as such. If so, then the Kellys were only being given an additional $130,000 in available credit at the time the document was created. To the extent Makras contends the document was dated in a way intended to include and memorialize the prior $70,000 loan, that conflicts with his argument that he did not collect interest on that loan because it was his commonplace practice to provide interest-free loans in similar circumstances.

[3] In this instance, however, there was no evidence suggesting the parties ever intended that the

Whether the line of credit modification or the $915,000 principal modification were "false" or fraudulent documents in the abstract, though, is not the relevant question. The documents were used as part of an attempt to show that Kellys in fact already owed $715,000 to the investors *and* $200,000 to Makras Real Estate, *before* the Quicken loan closed, with the intent and effect of inducing Quicken to pay $915,000 to Makras through escrow. Even putting aside those documents, the uncontroverted evidence showed that Makras drafted the payoff demand claiming the Kellys owed the Makras investors $715,000 and Makras Real Estate $200,000, and hand-wrote the VOM asserting the Kellys had a $915,000 mortgage loan.

Makras correctly observes that the government's liability contentions "boil down to" one basic theory: Makras and the Kellys should not have led Quicken Loans to believe the Kellys owed Makras Real Estate $200,000 when, as of September 2014, they had only received $70,000. Conversely, Makras' primary defense boils down to his argument that the Kellys *did* owe Makras Real Estate the full $200,000 no later than the time they signed the note for the $915,000 principal amount.

Makras repeatedly and vehemently insists the $915,000 note was an enforceable debt—in that full amount—the day it was signed. Makras contends he and the investors could have enforced it "even if, for example, the Kellys had dropped dead the day they submitted their loan application to Quicken." Despite the government's occasional characterization of the note as fraudulent, there is no real challenge to the notion that the investors could have enforced the note as to the $715,000 they had advanced. Likely Makras could have also enforced it as to the $70,000 he had loaned the Kellys. To support his proposition that the *full* $915,000 became an enforceable debt the moment the note was signed, however, Makras points only to the unremarkable general proposition that a promissory note is "an unconditional promise to pay money signed by the person undertaking to pay, payable on demand or at a definite time." Reply at 1, quoting *Saks v. Charity Mission Baptist Church*, 90 Cal. App. 4th 1116, 1132 (2001).

---

funds *necessarily* would be provided to the Kellys within a short time after the note was signed.

As *Saks* goes on to observe, however, a promissory note is subject to defenses, including failure of consideration, notwithstanding the presumption that it was given for sufficient consideration. 90 Cal. App. 4th at 1132-33. Had Makras not later paid out the $130,000, whether because the Kellys had "dropped dead" or for some other reason, the Kellys (or their estates) would have had a clear defense to repaying anything above and beyond the $715,000 to the investors and the $70,000 to Makras.

Makras insists "[t]he issue here is not what the Kellys had borrowed; it is what they owed." Reply at 6. Makras has failed to show, however, that the Kellys owed any more than they had actually borrowed. His claim that there was no evidence of any false statements on which a rational jury could convict is therefore not tenable.[4]

Finally, Makras asserts the misrepresentations were neither material nor communicated by him directly to Quicken. A rational jury could conclude the representations were material in light of testimony from government witnesses—and common sense—that a lender wants to have an accurate picture of a borrower's actual liabilities. Makras essentially is arguing for a "no harm, no foul" standard, because the extra $200,000 disbursed in escrow to him was sufficient to cover any and all of the Kellys' liabilities that had not accurately been disclosed to Quicken, and in fact was used for those purposes. The jury could rationally conclude, however, that Makras and Kelly did not have the right to choose for Quicken how those liabilities would be paid.

As to direct representations to Quicken, the jury was entitled to accept evidence that Makras knew the representations he made as to the amounts the Kellys owed were going to the lender. Accordingly, there is no basis to enter a judgment of acquittal in Makras' favor on the

---

[4] The government also argues the jury's findings against Makras are supportable in light of evidence that he aided and abetted Kelly in making additional false statements—primarily to the same effect—in the various loan application documents. Makras contends the lack of evidence that he ever saw the loan application documents precludes that theory. There was, however, abundant evidence from which a rational jury could find that Makras aided and abetted Kelly throughout the loan application process, specifically in connection with the misrepresentations, including evidence that Makras referred the Kellys to the loan broker and then communicated directly with the broker, and that Makras prepared the various documents described above.

counts for making a false statement to a bank and bank fraud.[5] To the extent the new trial motion is based on the same arguments that there was no evidence of false statements, it too must be denied.

B. Jury instructions

The balance of Makras' new trial motion asserts instructional error. First, Makras rehashes his arguments that Instruction No. 15 (the false-statement charge) should not have been expanded beyond the model instruction to suggest liability was possible if Makras made a statement "*submitted* to" a bank, rather than only a statement "to" a bank. Makras argues the effect of the change was potentially to impose liability for statements provided to a third-party (such as the title company).

The instruction as modified accurately stated the law. *See United States v. Mansour*, 883 F.2d 1025 (9th Cir. 1989) ("[i]t is sufficient if the proof shows that the defendant received notice sufficient to create a reasonable expectation that the statement would reach an institution of the type included in the statute.")  Although Makras argues to the contrary, there was abundant evidence to support a conclusion that he was on notice that the information he was providing was intended to go to Quicken. As just one example, when the broker sent Makras the request for a VOM, he stated "the lender is asking for these items." Ex. 66-1. Indeed, the purpose of a VOM is disclosed on the face of the form: "[The borrower has] applied for a mortgage loan and [has] stated that [the creditor has] extended a loan to [the borrower]. You [the creditor] are authorized to verify this information and to supply the lender with the information requested below." *Id.*

Second, Makras complains his proposed "good faith" instruction was refused. He was not

---

[5] Presumably to foreclose any possibility of retrial of the conspiracy counts as to which the jury deadlocked, as unlikely as that may be, Makras also seeks acquittal on those counts. Although this jury was unable to reach unanimous agreement as to conspiracy, a rational jury could do so, for substantially the same reasons discussed regarding aiding and abetting above, even though the elements are not identical.

entitled to the instruction, because the jury was adequately instructed as to intent. *See United States v. Shipsey*, 363 F.3d 962, 967 (9th Cir. 2004) ("[o]ur case law is well settled that a criminal defendant has "no right" to any good faith instruction when the jury has been adequately instructed with regard to the intent required to be found guilty of the crime charged . . . .") Makras was able to, and did, vigorously argue to the jury that he acted in good faith and therefore lacked the requisite intent to be convicted. The jury reached a rational conclusion to the contrary.

Third, Makras argues his requested "theory of the defense" instruction should have been given. As noted in the original ruling, the proposed instruction did not address any aspect of Makras' defense that was not otherwise fully covered by the instruction set. Rather, it was a summary of his contentions and positions. Even assuming a request for *some* "theory of the defense" instruction could have been supported, it would not have been this one, which represented appropriate closing argument, not instruction by the court.

Finally, Makras objects to the *Allen* charge given to the jury when they first reported possible deadlock, and to the jury subsequently being told "go back and indicate to us where you stand when you're ready to tell us," after the majority of them indicated deadlock, but the foreman and a minority suggested further deliberations could be productive. It is well-settled that *Allen* charges are generally appropriate, and Makras has failed to show why this instance would be an exception. The subsequent direction to the jury when they had not reached a consensus that further deliberations would serve no purpose was not unduly coercive.[6] The Rule 33 motion must be denied.

---

[6] Makras makes an additional claim that requiring the jury to continue deliberating may have allowed some of them to see news reports regarding a sentencing in another case involving a San Francisco public official, to prejudicial effect. This wholly speculative argument provides no basis for a new trial.

## IV.  CONCLUSION

Makras' motion for a judgment of acquittal or a new trial is denied.

**IT IS SO ORDERED**.

Dated: November 3, 2022

_____
RICHARD SEEBORG
Chief United States District Judge